Argued and submitted September 6, 2001, accused publicly reprimanded
June 7, 2002

# In re Complaint as to the Conduct of

## PAUL FLANNERY,
*Accused.*

## (OSB 00-98; SC S48338)

47 P3d 891

Chris L. Mullmann, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

Paul Flannery, Vancouver, Washington, argued the cause and filed the brief for himself.

PER CURIAM

**PER CURIAM**

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating two disciplinary rules of the Code of Professional Responsibility: Disciplinary Rule (DR) 1-102(A)(2) (prohibiting commission of "a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law"); and DR 1-102(A)(3) (prohibiting lawyer from engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation"). The Bar also alleged that the accused is subject to discipline under ORS 9.527(2) for having been convicted of a crime involving moral turpitude. During the ensuing proceedings, the accused conceded, and a trial panel of the Disciplinary Board concluded, that the accused had violated both disciplinary rules and had been convicted of a crime involving moral turpitude. The trial panel imposed a public reprimand.

The Bar sought review of the trial panel's sanction decision. ORS 9.536(1); Bar Rule of Procedure (BR) 10.3. This court reviews *de novo*. ORS 9.536(3); BR 10.6. We also impose a public reprimand.

## I. FACTS

The accused became a member of the Oregon State Bar in 1984. At the time of the relevant events, the accused was working as a deputy district attorney for Clackamas County. The accused lived in Portland, Oregon, until 1997, when he moved to Vancouver, Washington. Despite having moved, the accused continued to use his Oregon driver license.

In May 1999, the accused realized that his Oregon driver license had expired. The accused also realized that, unless he replaced the license immediately, he would be unable to rent a car at an upcoming conference in another state. The accused knew that it would take too long (10 to 14 days) to obtain a Washington driver license, but that he could renew his Oregon driver license before he left for the conference. The accused therefore chose to renew his Oregon license. In doing so, he listed as his residence the Canby address of his girlfriend's parents. As part of the renewal

application, the accused signed a statement to the effect that he understood that making any false statement in the application was against the law. The accused received a new Oregon driver license on the basis of that application.

Several months later, an Oregon City police officer stopped the accused for a traffic violation. The accused presented the Oregon driver license, but told the officer that he was living in Washington. The Clackamas County District Attorney's office learned of the incident and asked the Oregon State Police to investigate. As a result of that investigation, the state charged the accused with making a false application for a driver license, which is a Class A misdemeanor. ORS 807.530. The accused entered into a plea agreement, pleaded guilty, and received probation and a $700 fine. The district attorney's office dismissed the accused from his position. Several months later, the Bar filed its formal complaint against the accused, alleging that the foregoing facts constituted violations of DR 1-102(A)(2), DR 1-102(A)(3), and subjected the accused to discipline under ORS 9.527(2).

As noted, the accused conceded that his conduct violated both of the rules and the statute charged, and the trial panel so concluded. The trial panel then turned to the issue of an appropriate sanction. In that connection, the trial panel determined that the accused had violated his duty to the public to maintain the standards of personal integrity upon which the community relies and that he had acted with "knowledge," but that the conduct caused no actual or potential injury, except dishonor to the district attorney's office. The trial panel found two aggravating factors: (1) the accused had substantial experience in the practice of law; and (2) he acted with a dishonest motive. At the same time, the trial panel found that there were several mitigating factors, including the absence of any prior disciplinary record; the accused's timely good faith effort to rectify the consequences of his misconduct; his cooperation with the Bar; his good character and reputation save for this incident; his clear remorse; delay in the disciplinary proceeding; and the fact that the accused already had been subjected to other penalties, including a criminal conviction and fine, and the loss of his job. The trial panel concluded that the accused should receive a public reprimand. The trial panel explained:

"Although the conduct of the Accused was criminal, the Trial Panel does not find that the conduct 'seriously' adversely reflects on the Accused's fitness to practice. This is an isolated victimless incident which caused no injury and is unlikely to [recur]. The Accused has lost his career as a prosecutor and therefore has suffered severe 'other penalties' as a result of his actions."

The Bar, in seeking review, accepts the trial panel's conclusion that the accused violated the disciplinary rules as charged, but asks this court to suspend the accused for at least 60 days.

## II. DISCUSSION

As is apparent from the foregoing, the only issue presented in this case is whether this court ought to impose some sanction other than a public reprimand. This court described its methodology for determining an appropriate sanction in *In re Gustafson*, 333 Or 468, 486, 41 P3d 1063 (2002):

"This court first considers three factors in determining the appropriate sanctions: the duty violated; the accused lawyer's mental state; and the actual or potential injury caused by the accused lawyer's misconduct. * * * [Standards for Imposing Lawyer Sanctions (1991) (Amended 1993) (ABA Standards)] 3.0. We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted. * * * ABA Standard 3.0. Finally, we compare prior Oregon cases and the sanctions imposed in them."

(Some citations omitted.)

The Bar contends that the trial panel selected and applied the wrong standard when it chose a sanction. In particular, the Bar contends that the accused's conduct was "intentional," as the ABA Standards elsewhere define that term, and not merely "knowing." It characterizes the accused's misrepresentation on his driver license application as an "intentional, premeditated lie and crime made for personal gain," which "seriously" adversely reflects on the accused's fitness to practice law. According to the Bar, therefore, a suspension is appropriate.

## A. *Duty Violated*

We agree with both the trial panel and the Bar that the accused violated his duty to the public to maintain standards of personal integrity when he committed a crime that reflected adversely on his honesty. ABA Standard 5.1. As the commentary to ABA Standard 5.0 explains, that duty is founded on the public's rightful expectation that lawyers will uphold the highest standard of honesty and trustworthiness:

> "The public expects the lawyer to be honest and to abide by the law; public confidence in the integrity of officers of the court is undermined when lawyers engage in illegal conduct."

## B. *Mental State*

We turn to the accused's mental state. As noted, the trial panel found that the accused acted knowingly; the Bar asks this court to find that he acted intentionally. On that point, the accused argues that he "stipulated" to a particular mental state for purposes of sanction when he acknowledged at the hearing before the trial panel that he knew that he was not a resident of Oregon at the time that he certified the information on his driver license renewal application. Implicit in the accused's argument is a contention that the Bar now ought to be precluded from arguing on appeal that the accused's conduct warrants a harsher sanction because he acted *intentionally*. In response, the Bar asserts that it "stipulated" only to the underlying facts alleged in its pleading and to the ultimate conclusion that the accused had violated the two disciplinary rules charged and was subject to sanction under the pertinent statute. The Bar contends that the fact that its complaint alleges that the accused "knew" that the information that he provided to the Department of Transportation was false does not prevent the Bar from arguing or proving, for purposes of the determination of an appropriate sanction, that the accused acted intentionally.

■ Our *de novo* review of the record discloses that, in fact, there was no "stipulation" of the kind on which the accused relies. At the start of the hearing before the trial panel, the presiding member asked the parties to describe what actually was at issue. Counsel for the Bar suggested

that the only issue was sanction. The accused, whose answer had admitted the facts alleged in the Bar's complaint but had denied that those facts constituted violations of the specified statute and rules, then acknowledged that he had abandoned that position:

> "At this time I'm prepared, in fact, to stipulate to the fact that it does constitute a violation. *The only issue I think that remains would be to determine an appropriate sanction under these circumstances.*

> "\* \* \* \* \*

> "I would stipulate that it was a single act. I would like to emphasize that it was a single act. It would constitute violations of [the statute and rules]."

(Emphasis added.)

The presiding trial panel member then asked the counsel for the Bar to "please state for the record what you believe the stipulated facts are to see if [the accused] agrees to this stipulation." Counsel began with a summary of the facts alleged in the Bar's complaint and then stated: "I think the additional facts would be set out in Exhibit 4, I think, which is the [accused's] deposition." The presiding member then asked the accused directly whether he agreed with Bar counsel's statement, to which the accused answered, "I do."

As the foregoing demonstrates, the accused's premise for his argument concerning his state of mind is wrong. The parties did not stipulate that the trial panel could find only that the accused acted "knowingly." Rather, the trial panel was left to draw whatever conclusion respecting the accused's state of mind that the panel found to be justified by the evidence, including the evidence in the accused's deposition.

Indeed, that appears to us from the record to have been the accused's understanding at the time. Following the colloquy just quoted, the trial panel took a short recess to permit its members to familiarize themselves with the contents of the accused's deposition. The parties then turned to argument concerning the appropriate sanction. During that argument, the Bar urged the trial panel to find that the accused

had acted "intentionally." The accused responded, in essence, that his acts were not as pre-meditated as counsel for the Bar portrayed them. However, the accused never argued or even suggested that, in view of the "stipulations" just made, it would be impermissible for the trial panel to find that he had acted intentionally, as that concept is used in the ABA Standards.

■    We take this opportunity to make the following observation concerning "stipulations" in lawyer disciplinary proceedings. If there are to be such stipulations (and we encourage them), then it would be valuable to the trial panels (and to this court in exercising its *de novo* review function) to have the parties specify the issues to which such stipulations apply. As this proceeding demonstrates, proof of a violation of the disciplinary rules may require evidence of a particular state of mind, but the facts actually might demonstrate another, and more serious, one. Consequently, in order for a stipulation regarding a lawyer's state of mind to have the legal effect for which the accused here advocates, it expressly must identify the accused's state of mind for purposes of determining both guilt and sanction. Absent such a specific statement, this court in the future will treat a "stipulation" respecting an accused lawyer's mental state as relevant only to the issue of whether the accused lawyer violated the particular disciplinary rule or rules alleged in the Bar's complaint, and not as determinative of a specific mental state that might bear on the selection of an appropriate sanction.

■    Turning to the merits, we agree with the Bar that the accused's conduct in the present case was intentional. The ABA Standards define "intent" as "the conscious objective or purpose to accomplish a particular result." ABA Standards at 17. When the accused misrepresented his address in renewing his Oregon driver license, he did so with the "conscious objective or purpose" to obtain a valid driver license in time to rent a car at the upcoming conference. In light of that conscious purpose, the trial panel's conclusion that the accused acted merely with "knowledge" was incorrect.[1]

---

[1] "Knowledge" is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 17.

## C.  *Injury*

The injury caused by an accused lawyer's conduct includes actual or potential injury to a client, the public, the legal system, or the legal profession. ABA Standards at 7. In the present proceeding, the only injury that the accused's conduct caused was the reflection that it temporarily cast on the office of the Clackamas County District Attorney and on law enforcement generally.

## D.  *Preliminary Sanction*

At this point, we normally look to the ABA Standards for guidance as to an appropriate sanction. In this instance, however, we find that the ABA Standards are not a perfect fit. As discussed above, we conclude that the accused's conduct was "intentional" and not merely "knowing." The only standard that addresses a lawyer's *intentional* conduct relating to a lawyer's failure to maintain personal integrity is ABA Standard 5.11, which provides:

"Disbarment is generally appropriate when:

"(a)  a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

"(b)  a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

By its terms, however, ABA Standard 5.11 applies only in cases of "serious criminal conduct" or "other intentional conduct involving dishonesty * * * or misrepresentation" that "seriously" adversely reflects on the lawyer's fitness to practice law. No one argues that the accused's conduct in the present case rises to a level that would justify disbarment, notwithstanding that that conduct was intentional, criminal, and dishonest. The listed examples of the types of "serious" criminal misconduct, such as lying under oath in a

judicial proceeding, are of a kind that pose an immediate threat to the public; those examples are different from the accused's offense of misrepresenting his address on a driver license application. As we explain more fully below, we also do not deem the accused's conduct to reflect "seriously" on his fitness to practice law. We conclude that disbarment is not an appropriate sanction in this case.

Both the standard that the Bar advocates, ABA Standard 5.12, and the standard that the trial panel invoked, ABA Standard 5.13, address a lawyer's *knowing* conduct involving dishonesty, fraud, deceit, or misrepresentation. ABA Standard 5.12 provides:

> "Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice."

ABA Standard 5.13 provides:

> "Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."

The principal difference between those two standards lies in the degree to which the conduct in question adversely reflects on the lawyer's fitness to practice law. Suspension is appropriate if the conduct "seriously" adversely reflects on fitness; otherwise, reprimand is appropriate.

We begin our analysis respecting the foregoing standards by noting that the accused's misconduct was not committed in the course of his practice of law. We also note that the personal gain that the accused obtained through the misrepresentation was not financial and was relatively trivial.[2] Without minimizing the wrongfulness of the accused's conduct, those facts lead us to conclude that, although the accused's intentional misrepresentation of his address on an

---

[2] The Bar emphasizes the fact that the accused continued to drive under the unlawfully obtained Oregon license for several months. We do not find that that adds to the significance of his original, illegal act. The accused always was eligible for a Washington driver license. Obtaining one was only a minor inconvenience, which was not exacerbated with the passage of time.

application for a driver license does reflect adversely on his fitness to practice law, it does not do so "seriously." We therefore conclude that ABA Standard 5.12 is not, by its terms, applicable to the present set of facts. ABA Standard 5.13, on which the trial panel relied, is closer to the mark.

In sum, drawing together the duty violated, the accused's mental state, the injury caused, and the degree to which the accused's misconduct reflects on his fitness to practice, the closest fit under the ABA Standards is the sanction that ABA Standard 5.13 suggests, *viz.*, a public reprimand. We next consider whether any aggravating or mitigating factors, or this court's case law, mandate a different outcome.

E. *Aggravating and Mitigating Circumstances*

ABA Standard 9.22 lists aggravating factors that may be considered to justify an increase in the degree of discipline to be imposed in a particular case. Pertinent in the present proceeding are the facts that the accused acted with a dishonest or selfish motive, ABA Standard 9.22(b), and that he has substantial experience in the practice of law, ABA Standard 9.22(i).

ABA Standard 9.32 lists factors that may be considered in mitigation. There is no dispute that the following mitigating factors pertain in this proceeding: The accused has no prior disciplinary record, ABA Standard 9.32(a); the accused fully and freely provided information to the trial panel and cooperated fully in the disciplinary process, ABA Standard 9.32(d); the accused has demonstrated good character and a good reputation, save for this one incident, ABA Standard 9.32(g); the accused was subjected to other penalties and sanctions, ABA Standard 9.32(k); and the accused is remorseful, ABA Standard 9.32(l).

In addition to those mitigating factors, the trial panel found the following: that the accused made a timely, good faith effort to rectify the consequences of his misconduct, ABA Standard 9.32(d); and that there has been a delay in the disciplinary proceedings, ABA Standard 9.32(j). The Bar disputes both those findings. With regard to the accused's timely effort to rectify the misconduct, the Bar points out that the accused misrepresented his address in

May 1999, but he did not obtain a Washington driver license until after he was stopped by the police several months later. In addition, the Bar asserts that the disciplinary case against the accused proceeded apace and that there was no unusual delay in the proceedings.

We agree with the Bar on both points. Nonetheless, and after disregarding those two disputed factors, the mitigating factors outweigh the aggravating factors. At the very least, on this record, we cannot conclude that the combined consideration of the aggravating and mitigating factors justifies an increase in the degree of discipline to be imposed on the accused.

F.  *Case Law*

Finally, the Bar argues that Oregon case law indicates that, in most cases, a misrepresentation by a lawyer should result in a term of suspension. In support of that proposition, the Bar cites *In re Wyllie*, 327 Or 175, 957 P2d 1222 (1998) (lawyer suspended for two years for misrepresenting his compliance with Bar's MCLE requirements and for failing to cooperate with disciplinary investigation); *In re Staar*, 324 Or 283, 924 P2d 308 (1996) (lawyer suspended for two years for committing perjury when applying for restraining order); and *In re Unrein*, 323 Or 285, 917 P2d 1022 (1996) (lawyer suspended for 120 days for making multiple fraudulent applications for unemployment compensation benefits); *In re Melmon*, 322 Or 380, 908 P2d 822 (1995) (lawyer suspended for 90 days for simultaneously representing multiple clients with conflicts of interests and for knowingly making false statement to government agency); *In re Hopp*, 291 Or 697, 634 P2d 238 (1981) (lawyer suspended for 60 days for taking action for purpose of harassing another lawyer and for misrepresenting that he was doing so for "client," when he registered for local business's recently expired assumed business name and then demanded $100 to relinquish registration); *In re Houchin*, 290 Or 433, 622 P2d 723 (1981) (lawyer suspended for 30 days for enrolling as student in community college course that he was teaching to qualify for Veterans' Administration benefits).

In all the foregoing cases but one, the accused lawyer's misconduct was far more egregious than that presented

here. Of the cases that the Bar cites to us, the only case with facts analogous to the present case is *Houchin*. In that case, as here, a lawyer misrepresented a material fact on a government form to obtain a personal benefit, and the misrepresentation occurred outside the lawyer's practice of law. *Houchin* was a more serious case, however, because the lawyer derived a direct financial benefit from his mispresentation. Indeed, the court based its determination to suspend *Houchin* on the fact that the purpose of his misrepresentation was to obtain a financial advantage. *Houchin*, 290 Or at 439-40.

One other relevant case is *In re Carstens*, 297 Or 155, 683 P2d 992 (1984), on which the trial panel relied. In that case, a lawyer was publicly reprimanded after he was convicted of misdemeanor theft for signing his wife's name to the certificate of title for an item of personal property that the couple held jointly, and then selling it. There, the court considered the "facts and circumstances of the incident"—turmoil over the dissolution of the accused's marriage, which the court concluded had led to his "rash and impulsive act"—and concluded that those facts and circumstances weighed in favor of the accused lawyer. *Id.* at 166.

Pertinent to this proceeding, the court in *Carstens* concluded that the accused lawyer made a "serious mistake in judgment" in signing his wife's name to the document in question and that, had the accused reflected on the matter, he would have realized that whatever consent he once may have had to sign his wife's name in such circumstances must have been revoked when his marriage began to fail. *Id.* The accused lawyer otherwise was a person of good character and good reputation, and the court found that the act for which the accused lawyer was found guilty was unlikely to recur. *Id.* at 167. In light of all those circumstances, the court concluded that a public reprimand would protect the public adequately. *Id.*

The facts in this case fall somewhere between the facts in *Houchin* and the facts in *Carstens*. The accused's act here was not precipitated by any sort of emotional turmoil, but both the *Houchin* and *Carstens* cases involved greater personal gain for the accused lawyers than that obtained by

the accused here. Most significantly, we are persuaded, as the court was in *Carstens*, that the conduct giving rise to this proceeding is unlikely to recur. Given the foregoing considerations, together with the facts that the accused has suffered other serious penalties and that the accused's record heretofore was unblemished, we are satisfied that the public will be protected adequately if the accused receives a public reprimand.

The accused is publicly reprimanded.